J-S02044-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: ADOPTION OF J.J.A.B., JR. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: L.A.B., MOTHER | No. 2303 EDA 2014 |

Appeal from the Decree of July 1, 2014
In the Court of Common Pleas of Delaware County
Orphans' Court at No.: 0120-2013

BEFORE:  MUNDY, J., OLSON, J., and WECHT, J.

MEMORANDUM BY WECHT, J.:                    **FILED JANUARY 28, 2015**

L.A.B. ("Mother") appeals the July 1, 2014 decree that involuntarily terminated her parental rights to her son, J.J.A.B. ("Child"), who was born in August 2004.  After careful review, we affirm.

The record supports the following summary of the factual and procedural history of this case.  In June of 2011, a relative reported to the Delaware County Department of Children and Youth Services ("CYS") that Mother and Child were wandering the streets homeless.  The relative also reported that Mother's mental health was deteriorating, that Mother had removed Child from school, and that Child's teeth were decaying.  CYS was unable to locate Mother or Child, and the agency terminated its investigation in July of 2011.

On October 17, 2011, CYS received a second report from a relative indicating that Mother had been involuntarily committed to Crozer Chester Medical Center following a 302 hearing.[1]  Mother falsely reported to the Brookhaven Police Department that her entire family had been murdered. Officers went to the scene of the alleged homicides, but found no evidence that any crime had been committed.  After speaking with Mother's father, the police assured Mother that her family was alive and well.  Nevertheless, Mother continued to insist that her father had been killed and "cloned." Notes of Testimony ("N.T."), 5/19/2014, at 10.

In response to Mother's involuntary commitment, CYS implemented a safety plan and placed Child with his paternal grandmother.[2]  Following Mother's release from Crozer Chester Medical Center, Mother refused to cooperate with CYS's investigation.  On October 31, 2011, Mother violated the safety plan by removing Child from his grandmother's home.  CYS sought protective custody of Child, which the trial court awarded on November 2, 2011.  On November 3, 2011, the Chester Police Department located Mother and Child.  Mother was arrested and charged with interference with the custody of children, obstructing the administration of

---

[1]  **See** 50 P.S. § 7302 (allowing for involuntary emergency examination and treatment not exceeding one hundred twenty hours).

[2]  Child's biological father, J.B., was the victim of a homicide in 2004.

law or other governmental function, and endangering the welfare of children.[3] Child initially was placed in a foster home, but later was returned to his paternal grandmother.

On November 29, 2011, the trial court adjudicated child dependent and awarded physical and legal custody to CYS. CYS attempted to provide Mother with services designed to assist her in regaining custody of Child, but Mother refused to comply with CYS's recommendations. Specifically, Mother refused (1) to participate in parenting classes; (2) to seek mental health treatment; and (3) to undergo a drug and alcohol evaluation. Despite Mother's uncooperativeness, CYS continued to develop a plan to reunify Mother and Child.

Mother's dealings with CYS became increasingly hostile, with Mother frequently expressing delusional beliefs about CYS and its involvement with Child. For example, Mother believed that CYS had kidnapped Child and that CYS caseworkers were actively stalking her. Mother also alleged that CYS had "surgically altered" Child. N.T., 5/19/2014, at 48. In January of 2012, Mother filed for a protection from abuse order[4] against CYS caseworkers.[5]

---

[3]    18 Pa.C.S. §§ 2904, 5101, and 4304, respectively.

[4]    *See* 23 Pa.C.S. §§ 6106, *et seq.*

[5]    The petition ultimately was denied.

On February 16, 2012, Stephen Mechanick, M.D., conducted a psychiatric evaluation of Mother and concluded that she did not have the ability safely and adequately to parent Child. Dr. Mechanick explained as follows:

> When I met with [Mother,] I thought she was guarded and suspicious. She didn't appear to be particularly depressed or anxious and she described her mood as "good" and "normal." [Mother's] thought content showed evidence of paranoia and paranoid delusions. She did not have any suicidal or violent thoughts and she denied experiencing any auditory or visual hallucinations. I thought she had some difficulty with some of the cognitive evaluation, including naming presidents in order, subtraction, fund of information. I ask people to name three major U.S. cities and she had difficulty with that. And she had some difficulty with abstraction. So there was some cognitive difficulty that she displayed during my examination.
>
> * * *
>
> My conclusion was that her current diagnosis at that time was delusional disorder, persecutory type. Basically, she appeared to have a psychotic disorder with these paranoid features and delusions for many years[.] I also thought she had poor insight about her mental illness. She also had poor insight about how her mental illness might be affecting [Child.] And I also noted some concern about potential safety issues for [Child] were she to act on her paranoid thoughts while with [him].
>
> * * *
>
> At the time I recommended that [Mother] have psychiatric treatment. I thought she should have counseling to try to help her understand the nature of her mental illness. I thought that she should be prescribed medication to see if it could reduce or eliminate her delusional thinking. I recommended parenting classes to improve her parenting skills, as well as to provide feedback about how she actually was performing with her parenting. I recommended that all visits be supervised because of her history . . . with her son as well.

N.T., 5/19/2014, at 14-16.

Despite Dr. Mechanick's recommendations and CYS's reunification plan, Mother continued to insist that she was not suffering from any psychological issues and refused to participate in any of the mental health services offered by CYS. Mother also refused to participate in a bonding evaluation between herself and Child. She refused to assist CYS with general case planning. She refused to disclose any information regarding her living situation or her employment status. Mother's dealings with CYS's caseworkers were often argumentative, and she attended only fourteen of the fifty-two bi-weekly visits with Child that CYS offered her.

On November 21, 2013, CYS filed a petition to terminate Mother's parental rights. The trial court held hearings on the petition on May 19, 2014, and June 27, 2014. On July 2, 2014, the court issued a decree terminating Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). On July 29, 2014, Mother timely filed a notice of appeal and a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i). On September 5, 2014, the trial court filed its Rule 1925(a) opinion.

Mother presents the following questions for our review:

1. Whether the trial court's rulings were supported by sufficient evidence.

   a. The trial court erred in determining that [CYS] met its burden of proof by clear and convincing evidence that the statutory requirements of 23 Pa.C.S.A.

[§§] 2511(a)(1), (a)(2), (a)(5) and (a)(8) had been met for the involuntary termination of parental rights.

    b. The trial court erred in finding that CYS adequately provided Mother with the necessary services and assistance required under the proposed CYS service plan consistent with the stated goal of reunification.

    c. The trial court erred in finding that there was sufficient evidence present to establish the conditions which led to the removal or placement of the child continue to exist and that the involuntary termination of parental rights would best serve the needs and welfare of the trial [*sic*].

2. Whether the trial court's rulings were supposed [*sic*] by the weight of the evidence.

    a. The trial court erred in failing to consider the totality of the circumstances concerning the custodial issues between Mother and the paternal family members that gave rise to the initial removal of the child from Mother's custody.

    b. The trial court erred in failing to give the medical opinions of Mother's experts sufficient weight in issues pertaining to her mental health.

Brief for Mother at 4 (capitalization modified; footnote omitted).

It is well-established that we must accept the trial court's findings that are supported by competent evidence, and we will defer to the trial court on issues of credibility and weight of the evidence. ***In re Adoption of T.B.B.***, 835 A.2d 387, 394 (Pa. Super. 2003) (holding that if the trial court's findings are supported by competent evidence we will affirm even if the record could also support another result). Consequently, both of Mother's issues, although couched in terms of the sufficiency and weight of the evidence, are

governed by a single inquiry, *i.e.*, whether the trial court's findings are supported by competent evidence.

The standard and scope of review applicable in termination of parental rights cases are as follows:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re B.L.W.*, 843 A.2d 380, 383 (Pa. Super. 2004) (*en banc*) (internal citations omitted).

> Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

*In re Adoption of A.C.H.*, 803 A.2d 224, 228 (Pa. Super. 2002) (internal citations omitted).

This Court has explained the proper analysis for a termination petition, as follows:

> [U]nder Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's

conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only after determining that the parent's conduct warrants termination of his or her parental rights must the court engage in the second part of the analysis: [the] determination of the needs and welfare of the child under the standard of best interests of the child. Although a needs and welfare analysis is mandated by the statute, it is distinct from and not relevant to a determination of whether the parent's conduct justifies termination of parental rights under the statute. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child.

*In re Adoption of C.L.G.*, 956 A.2d 999, 1004 (Pa. Super. 2008) (*en banc*) (citations omitted).

Instantly, the trial court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), and (b). However, we may affirm the trial court's ruling by finding that sufficient grounds for termination have been established pursuant to any one subsection of 2511(a). *See In re B.L.W.*, 843 A.2d at 384. Accordingly, we confine our review to the trial court's analysis under subsections 2511(a)(8) and (b), which provide as follows:

**(a) General rule.—**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations.—**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

> To terminate parental rights pursuant to 23 Pa.C.S. § 2511(a)(8), the following factors must be demonstrated: (1) the child has been removed from parental care for 12 months or more from the date of removal; (2) the conditions which led to the removal or placement of the child continue to exist; and (3) termination of parental rights would best serve the needs and welfare of the child. Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the [child's] removal by the court. Once the 12-month period has been established, the court must next determine whether the conditions that led to the child's removal continue to exist, despite the reasonable good faith efforts of [the child welfare agency] supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of [the child welfare agency's] services.

*In re K.Z.S.*, 946 A.2d 753, 759 (Pa. Super. 2008) (citations omitted).

Regarding the "needs and welfare" analysis required by subsections 2511(a)(8) and (b), we have observed as follows:

> [I]nitially, the focus in terminating parental rights is on the parent, under Section 2511(a), whereas the focus in Section 2511(b) is on the child. However, Section 2511(a)(8) explicitly requires an evaluation of the "needs and welfare of the child"

- 9 -

prior to proceeding to Section 2511(b), which focuses on the "developmental, physical and emotional needs and welfare of the child." Thus, the analysis under Section 2511(a)(8) accounts for the needs of the child in addition to the behavior of the parent. Moreover, only if a court determines that the parent's conduct warrants termination of his or her parental rights, pursuant to Section 2511(a), does a court "engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child." Accordingly, while both Section 2511(a)(8) and Section 2511(b) direct us to evaluate the "needs and welfare of the child," we are required to resolve the analysis relative to Section 2511(a)(8), prior to addressing the "needs and welfare" of [the child], as proscribed by Section 2511(b); as such, they are distinct in that we must address Section 2511(a) before reaching Section 2511(b).

*In re C.L.G.*, 956 A.2d at 1008-09 (citations omitted).

Mother concedes that the first element of subsection 2511(a)(8) has been met, because Child has been removed from her care for more than twelve months. Brief for Mother at 23. Mother's argument as to the second element consists of nothing more than the conclusory assertion that "the conditions which led to the removal of [Child] do not continue to exist and the same was not proven by clear and convincing evidence." *Id.* We disagree.

In finding termination warranted under subsection (a)(8), the trial court relied upon competent evidence that Mother refused to seek psychiatric treatment or to participate in counseling. Specifically, Angela Phillips, a CYS supervisor, testified that Mother consistently denied having any psychiatric symptoms or disorders, and refused to undergo any mental health treatment. N.T., 5/19/2014, at 47, 53. Dr. Mechanick similarly

opined that Mother was unwilling to address her mental health issues and that, without treatment, she is unable to care safely and adequately for Child. *Id.* at 16.[6]

Additionally, CYS presented evidence that Mother exhibited persistent delusional beliefs, which caused her to become argumentative and uncooperative with the CYS caseworkers. For example, Mother accused CYS of "surgically altering" Child. She also filed for a protection from abuse order against the agency. *Id.* at 48, 56. Mother also refused to provide CYS with information regarding her housing situation or her employment status. *Id.* at 57. The trial court relied upon ample evidence that Mother's delusional thinking, as evidenced by her often-erratic behavior, continued to go unremedied for over two years following Child's removal.

Finally, the third prong of subsection 2511(a)(8) requires CYS to demonstrate that termination would serve the needs and welfare of Child. Here, the trial court made the following findings:

---

[6] Mother contends that the trial court erred "in failing to give the appropriate weight to the reports submitted by her own expert, Dr. Graff, who determined that Mother had a normal mental health status." Brief for Mother at 29. Indeed, Mother offered a report prepared by Harold Graff, M.D., which contradicted Dr. Mechanick's assessment of Mother's illness. Nevertheless, the trial court noted that Dr. Graff's report lacked a significant psychiatric history and was based primarily upon Mother's self-reporting. Trial Court Opinion ("T.C.O."), 9/5/2014, at 10 (unnumbered). Because we must defer to the trial court on issues of credibility and weight of the evidence, Mother's argument is without merit. *See In re Adoption of T.B.B.*, 835 A.2d at 394.

The evidence in this case irrefutably supports the finding that Mother is mentally ill and her prognosis for recovery is poor. She remains defiant and unwilling to cooperate with CYS or participate in services made available. Her mental status and decisions render her incapable of providing essential parental care and control of the child for an indefinite time. In the meantime, [Child] has been placed in circumstances where physical, mental and emotional needs are fully met. Despite the objective harshness of this outcome to Mother, there is no reason or justification to allow [Child] to wait at the train platform for the unscheduled train that will never arrive.

Trial Court Opinion ("T.C.O."), 9/5/2014, at 11 (unnumbered). Mother's brief is devoid of any discussion of the "needs and welfare" analysis required by subsection 2511(a)(8), and our review of the record demonstrates that the above findings and conclusions are supported by competent evidence.

Mother also challenges the trial court's finding that termination of her parental rights would best serve "the developmental, physical and emotional needs and welfare of" Child as required by subsection 2511(b). "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). The trial court also must consider the nature and status of the parent-child bond, particularly the effect upon the child of permanently severing that bond. *Id.*

The court may prioritize the safety needs of the child. *See In re K.Z.S.*, 946 A.2d at 763 (affirming involuntary termination of parental rights, despite existence of some bond, where placement with mother would be contrary to child's best interests). "[A] parent's basic constitutional right to the custody and rearing of his or her child is converted, upon the failure

to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of [the child's] potential in a permanent, healthy, safe environment." *In re B.,N.M.*, 856 A.2d 847, 856 (Pa. Super. 2004) (internal citations omitted).

Here, Mother argues that the best interests of the Child would be better served by allowing Child to remain in foster care while Mother continues to take steps toward reunification. Brief for Mother at 27. Mother also notes that CYS's own report acknowledged that Mother and Child shared a bond and that it was apparent that Child cared for his mother. *Id.*

It is undisputed that Child has a bond with Mother. However, the trial court relied upon competent evidence to conclude that severance of that bond would not cause Child undue dismay. Cynthia Conan, a licensed clinical social worker who provided individual counseling and emotional support to Child, stated that, "[Child] said he understood that his mother cannot take care of him and he hopes she is okay. He says he is happy with his paternal grandmother. He understands that he may live with her until he is grown. He seems apparently healthy and happy in her care." N.T., 5/19/2014, at 40 exh. 8.

The trial court also had before it a bonding evaluation conducted between Child and his paternal grandmother. That report concluded that the relationship between paternal grandmother and Child was positive and that Child was thriving. *Id.* at 65-66. Child's mental, physical, emotional, and developmental needs have been met by his paternal grandmother. *Id.*

- 13 -

Child continues to receive instructional and emotional support in school, and he participates in individual counseling and mental health therapy. *Id.* at 63. In contrast, Mother refused to attend a bonding evaluation with Child. Mother also testified that she was unaware of Child's special needs. N.T., 6/27/2014, at 41.

For the forgoing reasons, the trial court's termination of Mother's parental rights pursuant to 23 Pa.C.S. §§ 2511(a)(8) and (b) is supported by clear and convincing evidence; the trial court did not abuse its discretion in so finding.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/28/2015