J-S39004-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: B.J.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 938 MDA 2022 |

Appeal from the Decree Entered May 26, 2022
In the Court of Common Pleas of Luzerne County
Orphans' Court at No(s): A-9106

| | | |
|---|---|---|
| IN THE INTEREST OF: A.M.F.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: A.M.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 939 MDA 2022 |

Appeal from the Decree Entered May 26, 2022
In the Court of Common Pleas of Luzerne County
Orphans' Court at No(s): A-9107

BEFORE:  PANELLA, P.J., BENDER, P.J.E., and NICHOLS, J.

MEMORANDUM BY PANELLA, P.J.:          **FILED: JANUARY 13, 2023**

A.S. ("Mother") appeals the Luzerne County Court of Common Pleas' decree involuntarily terminating her parental rights to B.J.S. and A.M.F.S. (collectively "Children"). Mother argues the orphans' court abused its discretion by finding that the conditions which led to the removal of Children still existed, and that termination of Mother's parental rights to Children would

best serve their needs and welfare. We discern no such abuse of discretion, and we therefore affirm.

Mother is the biological mother of B.J.S., born in October 2014, and A.M.F.S., born in December 2017. B.J.S. and A.M.F.S. have different biological fathers. Children were living with Mother on May 31, 2019, when a caseworker from the Luzerne County Children and Youth Services Agency ("Agency") went to Mother's house after Mother refused telephone calls and other attempts of contact from the Agency about allegations it had received concerning Mother. The caseworker discovered Children lacked suitable beds in Mother's house, and that there were several unidentified individuals in the house. The whereabouts of both biological fathers was unknown at the time. It was later discovered that the father of B.J.S. had died and the father of A.M.F.S. was incarcerated. The Agency took Children into custody pursuant to an emergency care shelter order and placed them into the care of foster parents, where Children remain today.

After Children's removal from Mother's care, Mother was ordered to undergo services for parenting education, mental health treatment and drug and alcohol treatment, and attend supervised visits with Children. Based largely on Mother's noncompliance with Agency-referred services to meet her goals, the Agency filed a petition to terminate Mother's parental rights to Children pursuant to Pa.C.S.A. § 2511(a)(2), (a)(5), (a)(8) and (b). The Agency filed the petition on January 7, 2021, at which time Children had been

in placement for over 19 months. The Agency also filed a separate petition to terminate the parental rights of A.M.F.S.'s father as to A.M.F.S. on that same date. This appeal only pertains to the termination of Mother's parental rights, as A.M.F.S.'s father filed a separate appeal from the decree that ultimately terminated his parental rights to A.M.F.S.[1]

The orphans' court held hearings on the termination petitions on July 28, 2021, September 15, 2021, January 31, 2022 and March 7, 2022. At the hearing on July 28, 2021, Mother's counsel represented to the court that Mother was not in attendance as she intended to turn herself into authorities because there was an outstanding warrant for her arrest.

The matter proceeded, and the Agency presented the testimony of several witnesses. The Agency called Barbara Blanner, a case manager for the Intensive Family Reunification Program at Family Service Association of Northeast Pennsylvania, to the stand. Blanner testified that her program received a referral from the Agency for Mother in September 2019, but they were unable to get in touch with Mother until December 2019. *See* N.T., 7/28/21, at 46. Mother, however, missed several of her appointments and her case was ultimately closed for noncompliance in February 2020. *See id.* at 48, 49.

---

[1] That appeal is docketed in this Court at 916 MDA 2022.

Mike Barna, the program director for the Supervised Visitation Program at Vision Quest National, testified the Agency also referred Mother to Vision Quest for supervised visitation with Children. According to Barna, Mother had two visits with Children through Vision Quest. During the first visit, Mother left the visitation area to take a phone call and smoke a cigarette. *See id.* at 76. Then, at the second visit, Mother became aggressive towards, and screamed profanities at, the supervising caseworker. *See id.* at 76-77. Vision Quest terminated the visit, and told the Agency it would no longer supervise Mother's visits because of her behavior. *See id.* at 77.

The Agency also called Lisa Ross to the stand. Ross identified herself as a caseworker for Concern, another agency that received a referral to provide Mother with intensive family reunification services and visit coaching. Ross testified her initial assessment of Mother demonstrated that Mother needed to improve her parenting skills, and that she would benefit from a parenting course. *See id.* at 23-24. However, Ross had difficulty contacting Mother and Mother's attendance and participation in services was inconsistent. *See id.* at 13-14, 18. Ross testified she ultimately closed Mother's case because of these issues. *See id.* at 14, 15.

Cara Wagner, a site manager at Concern, testified Mother failed to appear for her first two scheduled supervised visits with Children, and was arrested prior to her third visit with them. *See id.* at 32-33. Wagner reported that after Mother was released from prison, Mother attended a supervised visit

with Children, but that she had been unable to contact Mother after that visit. *See id.* at 40. Wagner testified Mother's case was closed out for noncompliance on January 16, 2021. **See id.** at 40.

Alicia Singer, an outpatient mental health therapist at the Robinson Counseling Center, also testified at the hearing on July 28, 2021. She reported she had received two referrals from the Agency for Mother. Mother failed, however, to appear for either of her scheduled intake appointments. *See id.* at 58, 60.

Tony Bellizia, a caseworker for the Agency who had been involved with Childrens' case since August 2019, testified for the Agency at the hearings on September 15, 2021, January 31, 2022 and March 7, 2022. He stated that after Children were removed from Mother's care, Mother was ordered to engage in services for parenting, and to obtain an evaluation for mental health and an evaluation for substance abuse, should the Agency-directed urinalysis return a positive result. *See* N.T., 9/15/21, at 14. Bellizia reported, however, that Mother never submitted for a urinalysis despite being placed on the "color call" system. *See id.* at 12, 15.[2] He further testified Mother failed to complete the two parenting programs to which the Agency had referred Mother. *See id.* at 14.

---

[2] Bellizia agreed that the "color call" system is one where the client is assigned a certain color, and then must call into the system to determine if their assigned color requires them to report for a urinalysis screen for drugs and alcohol that day. *See id.* at 29.

Bellizia acknowledged Mother independently pursued mental health services at the Columbia, Montour, Snyder and Union treatment center ("CMSU"). She also independently underwent a drug and alcohol evaluation at CMSU, but did so without a referral from the Agency and the background information accompanying such a referral. *See id.* at 15, 28.

Bellizia testified Mother had been incarcerated twice since he had assumed responsibility for the case. *See id.* at 17, 42. As for visits with Children, Bellizia testified that Mother failed to appear for many scheduled visits. According to Bellizia, B.J.S. had become so upset by Mother's failure to appear for visits that he no longer wished to visit Mother. *See id.* at 17-18.

As for the scheduled visits Mother did attend, Bellizia testified Mother came unprepared and the visits were chaotic. *See* N.T., 1/31/22, at 13-14. He further testified that meals at restaurants were also chaotic, with Mother on her phone and "paying no attention to the kids." *Id.* at 14. During one visit, one of the children choked on a potato chip. *See id.* Bellizia maintained that the conditions prompting placement of Children continued to exist, and Mother had not shown she could remedy those conditions. *See* N.T., 9/15/21, at 17, 19.

Mother testified at the hearing on March 7, 2022. She reported she was incarcerated from July 2019 to October 2019, from September 2020 to November 2020 and then from August 2021 to December 2021, when she was

released on bail. Mother agreed that the most recent charges remained unresolved at the time of the hearing. ***See id.*** at 38-39.

Mother stated she did not have a driver's license because it had been suspended. ***See id.*** at 17, 41. At times, this led to transportation issues as far as visits with Children and her ability to get to parenting classes and to drug screens. ***See id.*** at 24, 32-34. Mother testified she completed a parenting class while she was incarcerated at Columbia County jail. ***See id.*** at 25, 34, 36.

Following the hearings, the orphans' court entered a decree terminating Mother's parental rights to B.J.S. and a decree terminating her parental rights to A.M.F.S. Both decrees were entered pursuant to Section 2511(a)(8) and 2511(b). Mother filed a notice of appeal from each decree, and this Court consolidated Mother's appeal challenging the termination of her parental rights to A.M.F.S. with her appeal challenging the termination of her parental rights to B.J.S.[3] Mother raises the following two issues in her consolidated appeal:

> I. Did the trial court abuse its discretion, commit[ ] an error of law, and/or there was insufficient evidentiary support in terminating the parental rights of [A.S.], natural mother of A.M.F.S. and B.J.S., as the grounds pursuant to 23 Pa.C.S.A. § 2511 (a)(2), (5), (8) were not established by clear and convincing evidence, and such granting of a petition to terminate parental rights was against the weight of the evidence presented by the parties.

_____

[3] The Agency mistakenly believes Mother's appeals were also consolidated with the appeal filed by A.M.F.S.'s father. They were not. As noted above, A.M.F.S.'s father filed a separate appeal from the termination of his parental rights to A.M.F.S.

II. Did the trial court abuse[ ] its discretion, commit[ ] an error of law, and/or there was insufficient evidentiary support for the court's decision that the best needs and welfare of the minor children A.M.F.S.[and B.J.S.] would be served by terminating natural mother's parental rights as required by 23 Pa. C.S.A. § 2511 (B).

Appellant's Brief at 3 (proposed answers omitted).

When this Court reviews an order of an orphans' court terminating parental rights, we must accept the findings of fact and credibility determinations of the court as long as the record supports them. *See In the Interest of D.R.-W.*, 227 A.3d 905, 911 (Pa. Super. 2020). If the findings of fact are supported by the record, this Court may only reverse the order if the orphans' court made an error of law or abused its discretion. *See id*. We may not reverse merely because the record could support an alternate result. *See id*. Instead, we give great deference to the orphans' court because those courts often have the opportunity to observe the parties first-hand over the course of multiple hearings. *See In re Adoption of K.M.G.*, 219 A.3d 662, 670 (Pa. Super. 2019). Further, the orphans' court, as the fact-finder, is free to believe all, part or none of the evidence presented and is likewise free to resolve any conflicts in the evidence. *See id*.

Termination of parental rights is controlled by Section 2511 of the Adoption Act. *See* 23 Pa.C.S.A. § 2511. Under Section 2511, the orphans' court must engage in a bifurcated process prior to terminating parental rights. *See In re L.M*., 923 A.2d 505, 511 (Pa. Super. 2007). Initially, the court must

find that the party seeking termination has proven by clear and convincing evidence that the parent's conduct satisfies any one of the eleven statutory grounds set forth for termination under Section 2511 (a). ***See id.***; 23 Pa. C.S.A. § 2511 (a)(1-11). If the orphans' court finds that one of those subsections has been satisfied, it must then, pursuant to Section 2511(b), make a determination of the needs and the welfare of the child under the best interests of the child standard. ***See In re L.M.***, 923 A.2d at 511; 23 Pa.C.S.A. § 2511(b).

Here, regarding the first prong of the analysis, the orphans' court found that the Agency had proven by clear and convincing evidence that Mother's conduct met the grounds for termination of her parental rights under Section 2511 (a)(8), which provides that parental rights may involuntarily be terminated on the grounds that:

> The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. § 2511(a)(8).

Under Section 2511(a)(8), then, the Agency was required to produce clear and convincing evidence that: (1) Children have been removed from Mother's care for at least 12 months; (2) the conditions which led to the removal or placement of Children continue to exist; and (3) the termination

of Mother's parental rights would best serve the needs and welfare of Children.

**See In re Adoption of M.E.P.**, 825 A.2d 1266, 1275-1276 (Pa. Super. 2003).

We have explained that:

> Section 2511(a)(8) sets a 12-month time frame for a parent to remedy the conditions that led to the children's removal by the court. Once the 12-month period has been established, the court must next determine whether the conditions that led to the [children's] removal continue to exist, despite the reasonable good faith efforts of the Agency supplied over a realistic time period. Termination under Section 2511(a)(8) does not require the court to evaluate a parent's current willingness or ability to remedy the conditions that initially caused placement or the availability or efficacy of Agency services.

**In re Z.P.**, 994 A.2d 1108, 1118 (Pa. Super. 2010) (citations and quotation marks omitted).

Mother does not dispute that, at the time of the filing of the petition, more than 12 months had elapsed since Children were removed from her home. Rather, Mother argues "the Agency failed to prove by clear and convincing evidence that the specific conditions that led to placement were no longer at issue." Appellant's Brief at 11. This claim does not entitle Mother to any relief.

In finding the conditions leading to Children's placement continued to exist, the orphans' court detailed the testimony of the Agency caseworker responsible for Children's case since August 2019, Tony Bellizia, regarding Mother's failure to comply with court-ordered services, **see** Orphans' Court opinion, 7/27/22, at 7-10; the testimony of the two caseworkers at Concern, Lisa Ross and Cara Wagner, outlining Mother's missed appointments and

visits, *see id.* at 10-13; the testimony of the case manager at the Family Service Association of Northeast Pennsylvania, Barbara Blanner, also outlining Mother's missed appointments there, *see id.* at 13-14; the testimony of the outpatient therapist Mother had been referred to, Alicia Singer, also outlining Mother's failure to appear for appointments, *see id.* at 14; and the testimony of the program director of Vision Quest, which terminated its supervision of Mother's visits as a result of Mother's volatile and threatening behavior, *see id.* at 14-15. The court then stated:

> Based on the above testimony and evidence presented, this Court finds that Mother has not successfully completed the services requested of her and has not remedied her parenting issues, mental health issues, and substance abuse issues.

*Id.* at 15. We see no abuse of discretion or error of law in this conclusion.

Mother argues, however, that she did address her mental health and substance abuse issues by independently seeking mental health services and a drug and alcohol evaluation at CMSU. Mother contends that the drug and alcohol evaluation did not require her to seek further treatment, and the orphans' court therefore erred by finding that she did not comply with the drug and alcohol component of her plan. In addressing this argument below, the orphans' court stated that:

> Bellizia testified that he was aware of the letter that he received from CMSU which stated that Mother had a drug and alcohol use evaluation and that she did not need treatment. Bellizia testified, however, that [the Agency] requested that Mother seek another drug and alcohol evaluation because CMSU was not provided Mother's appropriate background information for the evaluator to conduct a proper assessment. Bellizia testified that based on

- 11 -

Mother's behaviors and the arrest records that deal with substance abuse, having an appropriate drug and alcohol evaluation was necessary in this case.

*Id.* at 18 (citations to notes of testimony and title before Bellizia's name omitted). Given this testimony, we are not persuaded by Mother's argument that the trial court erred in finding that she had not successfully addressed the drug and alcohol component of her permanency plan.

Mother also asserts, in essence, that the court failed to take into account that she was unable to complete the parenting programs to which she was referred and to attend drug screens because she had transportation issues. However, as this Court has stated, Mother, like all parents, was required "to make diligent efforts toward the reasonably prompt assumption of full parental responsibilities." *In re A.L.D.*, 797 A.2d 326, 340 (Pa. Super. 2002) (citation and quotation marks omitted). And while Mother also maintains the court erred by failing to take into account that she participated in a parenting course while in prison, that course was not one Mother had been referred to by the Agency and does not negate her repeated failure to attend parenting programs to which the Agency did refer her.

Again, we see no abuse of discretion or error of law in the court's conclusion that the conditions which led to the placement of Children continue to exist, and therefore that the Agency established the first two prongs of the Section 2511(a)(8) test. The third prong of the test under Section 2511(a)(8) required the orphans' court to determine that termination of Mother's rights

would best serve the needs and welfare of Children. As noted above, Section 2511(b) also required the court to conduct a needs and welfare analysis of Children.

"Intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa. Super. 2005) (citation omitted). In determining a child's needs and welfare, the orphans' court is required to consider "whatever bonds may exist between the children and [the natural parent], as well as the emotional effect that termination will have upon the [children]." *In re Adoption of A.C.H.*, 803 A.2d 224, 229 (Pa. Super. 2002) (citation omitted). At the same time, the court should also consider the intangibles, such as the "love, comfort, security, and stability," the child might have with the foster parents. *In re K.Z.S.*, 946 A.2d 753, 760 (Pa. Super. 2008) (citation omitted).

In conducting the analysis here, the orphans' court highlighted the testimony of Jensen Cirelli, who had worked regularly with Children and their foster family as a case manager at Kids Peace Foster Care and Community Center. Cirelli stated that Children got along very well with the foster family, including the other children in the home; that B.J.S. consistently indicated he wanted to live with his foster family; that A.M.F.S. also indicated she wanted to live with her foster family; and that A.M.F.S. is doing "phenomenally" in preschool and B.J.S. is doing very well in school. *See* Orphans' Court Opinion, 7/27/22, at 22-23 (*citing* N.T., 3/7/22, at 78-81).

The orphans' court also noted Bellizia's testimony that Children are assimilated into the home of the foster family, who wish to adopt them. *See* Orphans' Court Opinion, 7/27/22, at 20. The court pointed to Bellizia's testimony that the foster family meets the physical, developmental, and emotional needs of Children, and there is a bond between Children and their foster family. *See id*. Children both call the foster parents "Mom and Dad," and seek them out for comfort and security. *See id.* at 21

The court further noted Bellizia opined that termination of Mother's rights would not have a detrimental impact on Children and in fact, would be positive because Children would have more consistency and predictability. *See id.* at 21-22.

Based on the above, along with testimony from the foster father, *see id.* at 22-24, the orphans' court concluded that it would best serve the needs and welfare of Children to terminate Mother's parental rights pursuant to Section 2511(a)(8) and (b). We discern no abuse of discretion in this conclusion.

In challenging the court's conclusion, Mother essentially complains the court placed undue weight on the caseworkers' testimony about the needs and welfare of the children without duly considering "environmental factors" such as her transportation issues and the COVID-19 pandemic. According to Mother, these environmental factors impeded her ability to bond with Children. In the first place, it is within the province of the orphans' court, as

fact-finder, to determine what weight is to be accorded to each witness's testimony. *See Commonwealth v. Williams*, 176 A3d 298, 306 (Pa. Super. 2017). Moreover, the orphans' court was well aware of Mother's testimony regarding her transportation issues, *see* Orphans' Court Opinion, 7/27/21, at 16-17, and that the COVID-19 pandemic occurred during Children's dependency, *see id.*

As for Mother's bond with Children, the orphans' court acknowledged Bellizia's testimony that A.M.F.S. had been participating in visits with Mother and enjoying them. Bellizia believed, however, that A.M.F.S. was "simply having fun" with Mother, and A.M.F.S. feels more secure in the foster home. *See id.* at 21. As for B.J.S., the court cited Bellizia's testimony that B.J.S. had requested that he no longer have visits with Mother, and that B.J.S.'s therapist did not believe it was in the best interest of B.J.S. to continue visits with Mother at that time. *See id.* at 21.

Based on all of the above, we see no abuse of discretion in the court's decision to terminate Mother's parental rights pursuant to Section 2511 (a)(8) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/13/2023